**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 96-20383

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

SAM AUTRY FLETCHER, also known as Junior;
FRANK WATTS, JR., also known as Poppa;
BRODERICK WILSON, also known as Roy Arnolia Brock;
JAMES ADAMS WATTS,

Defendants-Appellants.

Appeals from the United States District Court
For the Southern District of Texas
August 25, 1997

Before DUHÉ and BARKSDALE, Circuit Judges, and COBB[1], District
Judge.

DUHÉ, Circuit Judge:

Sam Autry Fletcher, Frank Watts, Jr., Broderick Wilson, and
James Adams Watts appeal their convictions for bank robbery and
conspiracy to commit bank robbery. We affirm the convictions and
sentences of Fletcher, Wilson, and Frank Watts. We also affirm
James Watts's convictions, but we vacate his sentence for bank
robbery and remand for resentencing.

BACKGROUND

On April, 26, 1995, three masked and armed assailants robbed

---

[1]District Judge of the Eastern District of Texas, sitting by
designation.

a Bank of America branch in Webster, Texas. Two of the robbers-- one described as very tall, the other as average height--approached Christine Gober's teller window and ordered her to surrender the money in the cash drawer. After Gober complied, the two perpetrators forced Gober and Denise Burse, the bank's manager, to open the vault. While the two robbers plundered the vault, the third assailant remained by the teller windows, where he threatened employee Penny Sondecker. The robbers eventually fled the bank with approximately $174,900.

Unknown to the perpetrators, witnesses outside the bank observed two masked men enter the bank and called the police from a restaurant across the street. The witnesses remained on the scene, and they eventually saw three men exit the bank, depart in a dark blue sedan, and drive into the parking lot of another nearby restaurant. Shortly thereafter, the witnesses noticed a silver-gray van, driven by a woman, leave the lot and enter the freeway. By this time, police officers had arrived at the bank, and the witnesses provided them with a description of the van and identified two digits, "11," on the van's license plate. This description was broadcast over police radio.

Larry Wittington, a Webster police officer, was driving on the freeway when he heard the radio report of the bank robbery and the description of the van. Shortly thereafter, he saw a silver van enter the freeway. Officer Wittington soon caught up to the van, which had the license plate "HCZ 11Y." While driving next to the van, he observed a black female in the driver's seat and a black

2

male, dressed in a suit, in the front passenger's seat. Although Officer Wittington was unable to apprehend the van, he later identified the passenger, from a photographic line-up, as James Watts. The van was also traced to James Watts's limousine service.

Because the assailants wore masks in the bank, none of the bank's employees actually observed their faces during the robbery. Gober and Burse, however, both testified that, based upon the robbers' dialect and Burse's observation of the tall robber's skin color around his eyes, they believed the perpetrators to be African-American men. Further, Gober and Burse told the investigating detectives that shortly before the robbery, a very tall, young black man had requested change for a $100 bill from one of the tellers. Sondecker also reported having observed a tall, slender black man in the bank approximately two weeks prior to the robbery. From a photographic display, Burse and Sondecker identified Sam Autry Fletcher as the tall black man who had been in the bank prior to the robbery, but Gober picked out a picture of another individual from the photographic array.

At trial, the Government also presented the testimony of Patrick McMillian, who was initially a suspect in the bank robbery. McMillian lived with Frank Watts, and he knew the four defendants from their participation in a rap music band that practiced at his house. McMillian testified that around the end of March 1995, three of the co-defendants (Frank Watts, James Watts, and Broderick Wilson) and James Watts's wife would frequently meet in Frank Watts's room with the door closed. On one evening, McMillian

3

eavesdropped outside the closed door and overhead James Watts talking about a bank robbery. On another occasion in April, McMillian observed all four defendants enter Frank Watts's room, and he overheard them discussing plans to steal a car to rob a bank and to switch to a van after completing the robbery. Finally, McMillian testified that on an afternoon in late April, the four defendants arrived at the house in James Watts's van and entered the house carrying bags. At that time, Fletcher told McMillian that he had just returned from a robbery with $30,000, and he showed McMillian a stack of $20 bills, the denomination of the money stolen from the bank.

After obtaining consent, FBI agents searched Frank Watts's mother's house. In the house, they discovered a safe, which they opened after obtaining a search warrant. Inside, they found 550 $20 bills. One of the bills matched a "bait bill" stolen from the bank. The majority of the remaining bills fell within the series of $20 bills that the Federal Reserve Bank had sent to the Bank of America in Webster, Texas. The police found Frank Watts's palm print on one of the bills and Wilson's thumb print on another.

In July 1995, a grand jury indicted Fletcher, Wilson, Frank Watts, and James Watts for: (1) conspiracy to commit robbery, in violation of 18 U.S.C. § 371; and (2) robbery by force, violence, and intimidation, in violation of 18 U.S.C. §§ 2113(a) and 2. The defendants were tried jointly before a jury, and each was convicted on both counts. As to count 1, the district court sentenced each of the defendants to 60 months of incarceration. As to count 2,

4

the district court sentenced James Watts to 262 months of incarceration, Fletcher to 188 months of incarceration, and Wilson and Watts to 151 months of incarceration. The sentences were to be served concurrently.

## DISCUSSION

### I. CONSTRUCTIVE AMENDMENT OF THE INDICTMENT

Count two of the indictment charged the Appellants with bank robbery, in violation of 18 U.S.C. § 2113(a),[2] and the district court instructed the jury as to the elements of that offense. After doing so, however, the court also instructed the jury as to the elements of a § 2113(d) bank robbery offense.[3] The instruction read as follows:

> Title 18, United States Code, Section 2113(d) makes it a more serious offense for anyone while in the process of violating subsection (a) of the statute to assault and put in jeopardy the life of any person by the use of a dangerous weapon or device.
>
> In order to establish the offense as charged in Count 2 of the indictment, the government must prove beyond a reasonable doubt each of the three specific acts I mentioned

---

[2]Section 2113(a) states, in pertinent part:
Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association . . . Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.
18 U.S.C. § 2113(a).

[3]Section 2113(d) states, in full:
Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.
18 U.S.C. § 2113(d).

5

a moment ago in discussing Count 2, and must also prove beyond a reasonable doubt a fourth specific fact, namely:

> That the defendant assaulted and put in jeopardy the life of a person by the use of a dangerous weapon or device while engaged in taking the money, as charged.

It is uncontroverted that the indictment charged the Appellants with violating only § 2113(a)--and not § 2113(d). Thus, we conclude that the district court erred in giving the instruction appropriate for § 2113(d), and that in so doing, it constructively amended the indictment. See United States v. Slovacek, 867 F.2d 842, 847 (5th Cir. 1989) (stating that constructive amendment of the indictment occurs if "the court, through its instructions and facts it permits into evidence, allows proof of an essential element of a crime on an alternative basis permitted by the statute but not charged in the indictment"). The more difficult question that we face, however, is whether the error requires reversal of the Appellants' convictions. We conclude that it does not.

Because the Appellants failed to object at trial to the erroneous jury instruction, we may address the claim, pursuant to Fed. R. Crim. P. 52(b), only if (1) there was an error, (2) the error was plain, and (3) the plain error affected the substantial rights of the defendant. See United States v. Olano, 507 U.S. 725, 731-34 (1993); United States v. Calverley, 37 F.3d 160, 162-64 (5th Cir. 1994). If all three conditions are satisfied, we may exercise our discretion to correct the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736 (internal quotation marks omitted; alteration in original).

6

The seminal case governing constructive amendment of an indictment is <u>Stirone v. United States</u>, 361 U.S. 212 (1960). In <u>Stirone</u>, the Supreme Court reversed a criminal conviction because the district court's jury instructions constructively amended the indictment. The Court stated:

> While there was a variance in the sense of a variation between pleading and proof, that variation here destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error.

<u>Id.</u> at 217. Following <u>Stirone</u>, we have emphasized that constructive amendment of the indictment through erroneous jury instructions requires *per se* reversal of the defendant's convictions. <u>See</u>, <u>e.g.</u>, <u>United States v. Salvatore</u>, 110 F.3d 1131, 1145 (5th Cir. 1997); <u>United States v. Harrill</u>, 877 F.2d 341, 344 (5th Cir. 1989); <u>United States v. Ylda</u>, 653 F.2d 912, 913 (5th Cir. 1981). Indeed, we have held that reversal is "automatic" even when a defendant fails to object to the erroneous instructions, thus subjecting his appeal to plain error review. <u>See</u> <u>United States v. Mize</u>, 756 F.2d 353, 355-56 (5th Cir. 1985).

Both <u>Stirone</u> and the Fifth Circuit case law interpreting it, (except <u>Salvatore</u> in which no constructive amendment was found), predate the Supreme Court's opinion in <u>Olano</u>, which set forth the current standard governing plain error. Following <u>Olano</u>, this circuit, in <u>United States v. Reyes</u>, 102 F.3d 1361, 1364-66 (5th Cir. 1996), concluded that we have *discretion* to correct a <u>Stirone</u> error--an error that, prior to <u>Olano</u>, would have required reversal

7

*per se*.[4]    Further, in <u>Reyes</u>, we declined to exercise our discretion to correct an error that resulted in a constructive amendment of the indictment.  <u>See</u> <u>id.</u>

For a number of reasons, we choose not to correct the error in this case.  First, we are confident that the Appellants were in no way prejudiced by the erroneous instruction.  The court instructed the jury as to the elements of § 2113(d), which is a greater degree of bank robbery than the indicted offense of § 2113(a).  In fact, the elements of § 2113(d) include all of the elements of § 2113(a), plus the additional element of assault.  Therefore, by instructing the jury as to § 2113(d), the court actually imposed a higher standard of proof on the Government than that required by the indictment.  Because the jury found that the Government established the elements of § 2113(d) bank robbery, it must necessarily have found that the Government proved the elements of § 2113(a) bank robbery.  Thus, the erroneous instruction did not impair the "substantial rights" of the Appellants because it could not have affected the outcome of the trial.  <u>See</u> <u>Olano</u>, 507 U.S. at 734.

Moreover, to hold that a constructive amendment of the indictment requires *per se* reversal even under <u>Olano</u> would

---

[4]  The Appellants asserts that even under <u>Olano</u>, at least one circuit court has held that a constructive amendment must be corrected on appeal.  <u>See</u> <u>United States v. Floresca</u>, 38 F.3d 706, 714 (4th Cir. 1994) (en banc) ("In sum, we hold that, under <u>Stirone</u>, constructive amendments of a federal indictment are error *per se*, and, under <u>Olano</u>, must be corrected on appeal even when not preserved by objection.); <u>see</u> <u>also</u> <u>United States v. Lawton</u>, 995 F.2d 290, 294-95 (D.C. Cir. 1993) (exercising its discretion under <u>Olano</u> to correct a <u>Stirone</u> error not raised at trial). Notwithstanding <u>Floresca</u> and <u>Lawton</u>, we are bound by <u>Reyes</u>, a prior panel decision of the Fifth Circuit.

encourage the kind of sandbagging that the plain error standard is designed in part to prevent.  See Reyes, 102 F.3d at 1365.  Were we to so hold, no rational defense counsel would ever object to the erroneous instructions in a prosecution similar to this one:  not only would the erroneous instruction increase the likelihood of acquittal,[5] but defense counsel would also know that a conviction would necessarily be reversed on appeal.  See id. at 1365-66.  Such a situation does not accord with justice or common sense.[6]

Finally, we recognize that the district court sentenced James Watts to 262 months of imprisonment as to count two--a punishment commensurate with conviction under § 2113(d).  But although the

_____

[5]Indeed, this situation is more stark than that in Reyes, where we noted that the defendant faced identical odds of being convicted under either the correct or erroneous charge.  See Reyes, 102 F.2d at 1365.

[6]We note, by way of caution, that we do not seek to minimize the import of numerous appellate decisions that have repeatedly recognized the seriousness of a trial error that results in a constructive amendment of the indictment.  Those decisions have emphasized that a constructive amendment of the indictment is so pernicious as to require reversal *per se* because, in the typical case, the constructive amendment *broadens* the indictment such that a defendant might be convicted for a crime not charged therein. See, e.g., Stirone, 361 U.S. at 216 (noting that only the grand jury may broaden an indictment); Floresca, 38 F.3d at 710, 711 ("A constructive amendment to an indictment occurs when . . . the court . . . broadens the possible bases for conviction beyond those presented by the grand jury. . . . We stress that it is the broadening itself that is important--nothing more."); Lawton, 995 F.2d at 290 (noting that the jury instructions expanded the indictment); Harrill, 877 F.2d at 344 (stating that "a conviction must be reversed if the court's instructions to the jury amend the indictment to enlarge the offense").  In this case, however, the erroneous instruction did not broaden or expand the indictment; rather, it narrowed the indictment by requiring the Government to prove the additional assault element of § 2113(d). Given that the jury convicted the Appellants of § 2113(d), there is simply no doubt that they would have convicted under the lesser standard of § 2113(a).

9

court instructed the jury as to the elements of § 2113(d), it is undisputed that Watts was indicted--and can only be convicted--for violating § 2113(a). Indeed, the court's judgment reflects this fact. Section 2113(a) carries a statutory maximum penalty of 20 years (240 months) imprisonment. Because Watts's sentence exceeds the statutory maximum, we must vacate his sentence and remand for resentencing.

## II. PHOTOGRAPHIC IDENTIFICATION

Appellants James Watts and Sam Autry Fletcher assert that their Fifth Amendment rights were violated by the introduction of impermissibly suggestive and inherently unreliable photographic identification evidence. The question whether identification evidence and the fruits therefrom are admissible at trial is a mixed question of law and fact. See United States v. Sanchez, 988 F.2d 1384, 1389 (5th Cir. 1993). Such mixed questions are subject to *de novo* review. See Buser by Buser v. Corpus Christi Indep. Sch. Dist., 51 F.3d 490, 492 (5th Cir. 1995). However, we review the district court's underlying factual findings for clear error. See United States v. Diecidue, 603 F.2d 535, 565 (5th Cir. 1979).

A conviction based upon an eyewitness identification at trial following a pretrial photographic identification must be set aside "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968); accord Herrera v. Collins, 904 F.2d 944, 946 (5th Cir. 1990). The admissibility of identification

evidence is governed by a consideration of two factors.  See Herrera, 904 F.2d at 946.  First, the court must determine whether the photographic array was impermissibly suggestive.  See Sanchez, 988 F.2d at 1389.  If it was, then the court must consider whether, based upon the totality of the circumstances, "the display posed a 'very substantial likelihood of irreparable misidentification.'" Id. (quoting Simmons, 390 U.S. at 384); see also Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (stating that the gravamen of this determination is reliability).  In examining the totality of the circumstances regarding reliability, the court should specifically consider:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 199 (1972).

*A.    James Watts*

Officer Larry Wittington, during his pursuit of the silver getaway van on April 26, 1995, observed a black male wearing a suit and tie sitting in the passenger seat.  Three days later, Officer Wittington was shown a display of six photographs.  He selected a photograph of James Watts as the person who was riding in the passenger seat of the van.  On appeal, Watts contends that the district court's admission of the photographic identification evidence was constitutionally infirm because:  (1) his picture was the only one in the array in which the subject was dressed in a suit and tie; and (2) his picture was positioned in the center

11

position of the top row. We conclude otherwise.

The district court, faced with a similar objection, determined that although the photograph of Watts was the only one in which the subject was wearing a suit and tie, the photographic display was not impermissibly suggestive because "in all other relevant respects, the individuals shown on the photo spread are similar in apparent size, all have mustaches, all have approximately the same kind of hair." Watts does not dispute the district court's factual finding that the physical appearance--aside from the clothing--of the individuals in the six photos was very similar, and we therefore accept this fact as true. Accordingly, we do not believe that the array was overly suggestive merely because the defendant was the only individual pictured wearing a suit and tie. Further, it is irrelevant that Watts's photograph was located in the top center position of the display. We therefore hold that the court did not err in allowing the identification testimony into evidence.[7]

*B.   Sam Autry Fletcher*

Three bank employees, Christine Gober, Denise Burse, and Penny Sondecker, informed the investigating authorities that shortly before the robbery, they had observed a very tall black man in the bank. Each of these employees was later shown a photographic display containing 26 pictures of various black men. Of the 26 photos, only five gave any indication as to the height of the

---

[7]Because we hold that the photographic display was not overly suggestive, we need not reach the second part of the analysis, *i.e.*, whether the identification was unreliable.

12

individual depicted therein:  one photo, that of Fletcher, pictured a person who was 6'7" tall; two photos depicted individuals who were between 6'1" and 6'2" tall; and two photos portrayed individuals who were well under 6' tall.  Two of the employees, Burse and Sondecker, identified Sam Autry Fletcher as the man they had previously seen in the bank, while Gober identified another individual in the photo spread.  The district court denied Fletcher's motion to suppress the identification testimony.  On appeal, Fletcher asserts that the photographic display was impermissibly suggestive and unreliable because it emphasized his unusual height.  Again, we disagree.

The photographic array contained 26 photos of African-American males of about the same age.  Only five of the photographs depicted the height of the individual pictured therein, and of the five photos, three portrayed men over 6 feet tall.  While it is true that the photograph of Fletcher was the only one that depicted a subject who was well over 6 feet tall, there were 21 other photographs that provided no indication as to the height of the individuals.  Cf. United States v. Credit, 95 F.3d 362, 364 (5th Cir. 1996) (admitting photographic identification evidence even though the defendant was the only heavy-set man with a round face in a photographic display of six men of similar age and skin tone), cert. denied, 117 S. Ct. 1008 (1997).

Even assuming, *arguendo*, that the photographic display was impermissibly suggestive, we do not believe that the witnesses' identification was unreliable.  Of the five Biggers factors, only

13

one, the level of certainty of the witness, weighs in Fletcher's favor, as both Sondecker and Burse offered only "tentative" identifications.[8]    The other four factors, however, favor admissibility.   Burse especially had ample opportunity to view Fletcher when he cased the bank on the morning of the robbery. Moreover, both Burse and Sondecker testified that their attention was drawn to Fletcher because he was a very tall black man that they had not previously observed in the bank; in fact, Sondecker described him as "striking."    Further, the witnesses' prior description of Fletcher was accurate, as he is indeed a very tall black man.    Finally, both Burse and Sondecker viewed the photographic display within a few weeks of their initial sighting of Fletcher.    Thus, we conclude that even if the photographic display was impermissibly suggestive, it did not pose a substantial likelihood of misidentification.

III. SUFFICIENCY OF THE EVIDENCE

James Watts and Broderick Wilson contend that the evidence was insufficient to sustain their convictions.  A criminal conviction must be upheld if any rational jury could have found that the evidence established the essential elements of the crimes charged beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Ismoila, 100 F.3d 380, 387 (5th Cir. 1996), cert. denied, 117 S. Ct. 1712, and cert. denied, 117 S. Ct.

---

[8]Even this, however, only marginally favors inadmissibility, for Sondecker herself testified that when she looked at the photographic array, she was sure that the photograph she had selected was that of Fletcher.

14

1858 (1997).  We view the evidence, including all reasonable inferences drawn therefrom and all credibility determinations, in the light most favorable to the jury verdict.  See United States v. Resio-Trejo, 45 F.3d 907, 910 (5th Cir. 1995).

To sustain a conspiracy conviction under 18 U.S.C. § 371, the Government must prove:  (1) an agreement between two or more persons, (2) to commit a crime, and (3) an overt act committed by one of the conspirators in furtherance of the agreement.  See United States v. Gray, 96 F.3d 769, 772-73 (5th Cir. 1996), cert. denied, 117 S. Ct. 1275 (1997).  To prove the underlying offense of bank robbery, in violation of 18 U.S.C. § 2113(a), the Government must establish:  (1) an individual or individuals, (2) used force and violence, or intimidation, (3) to take or attempt to take, (4) from the person or presence of another, (5) money, property, or anything of value, (6) belonging to or in the care of, (7) a bank. See United States v. McCarty, 36 F.3d 1349, 1357 (5th Cir. 1994).

Viewed in the light most favorable to the verdict, the evidence is sufficient to sustain the convictions of both James Watts and Broderick Wilson.  Specifically, the Government presented the following:  McMillian's testimony that on two occasions he heard James Watts and Wilson planning the bank robbery in Frank Watts's room; McMillian's testimony that he observed the four defendants return to his house in the silver van carrying a number of bags, and his testimony that Fletcher, on the same date, admitted to participating in a robbery; Officer Wittington's identification of James Watts as the passenger in the van that fled

15

the scene of the crime; Wilson's fingerprint on one of the $20 bills seized from Frank Watts's safe; evidence establishing that the van fleeing the bank belonged to James Watts's limousine business; testimony demonstrating that although James Watts and Wilson had no visible means of support before the robbery, they spent substantial sums of money after the bank robbery.

Much of the Appellants' argument centers on attacking the credibility of Wittington and McMillian. We must, however, draw all credibility determinations in the light most favorable to the verdict. See Resio-Trejo, 45 F.3d at 910. Doing so, we conclude that the evidence is sufficient to sustain the convictions of James Watts and Broderick Wilson.

IV. PROSECUTORIAL STATEMENTS

*A. During Closing Argument*

Fletcher insists that his conviction must be reversed because of the prosecutor's improper comments during closing argument. Specifically, he contends that during closing argument, the prosecutor referred to the following inculpatory "facts" that were never introduced into evidence: that Fletcher was homeless around the time of the bank robbery;[9] that Fletcher lied by telling an FBI agent that he had never been to Webster, Texas; and that Denise Burse made an in-court identification of Fletcher.

We will reverse a conviction for improper prosecutorial remarks only where the defendant's right to a fair trial is substantially affected. See United States v. Andrews, 22 F.3d

---

[9]This statement is the only one to which Fletcher objected.

16

1328, 1341 (5th Cir. 1994). The critical question that we must resolve is whether the prosecutor's remarks "cast serious doubt on the correctness of the jury verdict." Id. The relevant factors to consider are: (1) the magnitude of the prejudicial effect, (2) the efficacy of any cautionary instruction, and (3) the strength of the evidence supporting the defendant's guilt. See id. Because Fletcher objected to only one of the allegedly improper comments, he bears an even greater burden; we will reverse only upon a showing of plain error. See id. In such a situation, Fletcher must show that the plain error jeopardizes his "substantial rights" and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." See Calverley, 37 F.3d at 164 (internal quotation marks omitted). This he has not done.

The prejudice resulting from the prosecutor's comments is slight. The first remark--that Fletcher was homeless--is inconsequential and was made only in passing. The prosecutor's second statement--that Fletcher lied by asserting that he had never been to Webster, Texas--is only slightly prejudicial. The important fact is not that Fletcher lied, but that witnesses placed him at the Bank of America in Webster, Texas. The prejudice resulting from this remark is far from enough to warrant reversal under the plain error standard. Finally, the prejudicial effect of the third remark--that Burse identified Fletcher in court--is slight because she did identify him in a photo array and because Penny Sondecker identified Fletcher in court.

The other two factors outlined in Andrews also support

17

affirmance.  The court never had the opportunity to caution the jury as to two of the statements because none of the defendants objected to the prosecutor's statements.  Finally, as we outlined in Part III of this opinion, the evidence linking Fletcher to the crime is substantial.  Thus, we decline to reverse Fletcher's conviction on this ground.

*B. During Direct Examination*

Fletcher also contends that the district court erred by refusing to give a curative instruction after the prosecutor asked the following question of FBI Agent Eric Johnson: "When you talked to . . . Sam Fletcher, do you recall him mentioning anything about robbing banks?"  Fletcher insists that this question was extremely prejudicial because it suggested to the jurors that Fletcher had admitted to robbing a bank.

We do not think that the effect of this question is nearly as prejudicial as Fletcher maintains.  Before Agent Johnson could respond to the query, Fletcher's counsel objected, and the district court instructed the prosecutor to move to another area of inquiry.  Later, outside the presence of the jury, the court determined that Fletcher's alleged admission was inadmissible under Fed. R. Evid. 404(b).  However, he refused to give a curative instruction to the jury, stating:

> Well, the jury . . . has already been told and will be told again at the end of the case [that] . . . what the attorneys say is not evidence and to disregard questions when objections are raised and not to speculate on what the answers would have been.  At this stage I don't think [a curative instruction] would be appropriate.  I'm having a hard time thinking of how I could make the point to the jury without reminding them of what the question was, which I think would defeat the purpose

18

that you have suggested.

We fully agree with the court's reasoning. Juries are presumed to follow the instructions of the court. See Zafiro v. United States, 506 U.S. 534, 540-41 (1993).

V. SEVERANCE

Wilson contends that the district court erred by denying his motion to sever, thereby violating his Sixth Amendment right to confrontation as explained by Bruton v. United States, 391 U.S. 123 (1968). We review Bruton issues for abuse of discretion. See United States v. Beaumont, 972 F.2d 91, 95 (5th Cir. 1992).

The Fifth Circuit has held that, under Bruton, a defendant's Sixth Amendment right to confrontation is violated when "'(1) several co-defendants are tried jointly, (2) one defendant's extrajudicial statement is used to implicate another defendant in the crime, and (3) the confessor does not take the stand and is thus not subject to cross-examination.'" United States v. Jobe, 101 F.3d 1046, 1066 (5th Cir. 1996) (quoting United States v. Restrepo, 994 F.2d 173, 186 (5th Cir. 1993)), petition for cert. filed, 66 U.S.L.W. 3016 (Jun. 25, 1997). A defendant's right to confrontation is violated, however, only when the co-defendant's statement directly incriminates the other defendants without reference to other admissible evidence. See id. The Supreme Court has stated, "We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any

19

reference to his or her existence."  Richardson v. Marsh, 481 U.S. 200, 211 (1987).

In this case, Wilson claims that his Sixth Amendment rights were violated by the admission of Patrick McMillian's testimony regarding the confession of co-defendant Fletcher.  The Government, however, redacted McMillian's statement, and McMillian testified that Fletcher admitted only that "*he* [*i.e.*, Fletcher] just came back from a bank robbery."  On appeal, Wilson insists that taken in context--Fletcher made the confession shortly after arriving at McMillian's house in the silver van with the other defendants--the statement directly implicates him in the crime.  We disagree.

On its face, the statement itself--that Fletcher had just committed a bank robbery--certainly does not directly implicate Wilson.   It becomes incriminating only by reference to other testimony, which is permissible under Richardson.  Moreover, as required by Richardson, the district court repeatedly instructed the jury that Fletcher's statement could be used against Fletcher only, and could not be considered as to any other defendant.[10]  We therefore conclude that the admission of McMillian's statement regarding Fletcher's confession did not violate Wilson's rights under the Confrontation Clause.

VI. THE FIREARM ENHANCEMENT

---

[10]Wilson argues that the prejudice was magnified because the prosecutor, during closing argument, mentioned that Fletcher told McMillian, "we just did it--I just did it."  As the quoted phrase shows, however, the prosecutor immediately corrected himself as to Fletcher's confession, and he later emphasized that Fletcher said only that "I just did it."  Furthermore, the district court instructed the jury to disregard the prosecutor's statement.

Finally, the Appellants contend that the district court erred by enhancing their sentences pursuant to U.S.S.G. § 2B3.1(b)(2)(B), which mandates a six-level enhancement when a firearm is "otherwise used"--but not discharged--during the commission of a robbery. The Appellants maintain that the court should have enhanced their sentences by only five levels, pursuant to § 2B3.1(b)(2)(C), because they merely "brandished, displayed, or possessed" a weapon during a robbery.

The Guidelines define "otherwise used" as conduct that "did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1 app. note 1(g). In United States v. Gonzales, 40 F.3d 735, 738-40 (5th Cir. 1994), we stated that the "otherwise-used" enhancement includes a situation where a defendant both points a weapon at a victim and also *explicitly* threatens the victim. Because the defendants both pointed their weapons at the bank employees and explicitly threatened them, we conclude that the district court, pursuant to Gonzales, properly enhanced their sentences by six levels.[11]

CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences of Frank Watts, Sam Autry Fletcher, and Broderick Wilson, and we affirm the convictions of James Watts, but vacate his sentence as to count two and remand for resentencing.

AFFIRMED in part; VACATED and REMANDED in part.

---

[11]One panel of the Fifth Circuit may not overrule the decision of another panel. See United States v. Storm, 36 F.3d 1289, 1297 (5th Cir. 1994).

21